IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

PAUL JOSEPH LAIR JR.,               §
                                    §
            Petitioner,             §
                                    §
v.                                  §        No. 4:15-CV-816-Y
                                    §
LORIE DAVIS, Director,[1]           §
Texas Department of Criminal        §
Justice, Correctional               §
Institutions Division,              §
                                    §
            Respondent.             §


## OPINION AND ORDER

Before the Court is a petition for writ of habeas corpus
pursuant to 28 U.S.C. § 2254 filed on behalf of petitioner, Paul
Joseph Lair Jr., a state prisoner, against Lorie Davis, director of
the Texas Department of Criminal Justice, Correctional Institutions
Division, Respondent.

After having considered the pleadings and relief sought by
Petitioner, the Court has concluded that the petition should be
denied.

## I.  FACTUAL AND PROCEDURAL HISTORY

In August 2009, in the 213th Judicial District Court, Tarrant
County, Texas, Petitioner was charged in a multi-count indictment
with aggravated sexual assault of a child and indecency with a

---

[1]Effective May 4, 2016, Lorie Davis replaced William Stephens as director
of the Correctional Institutions Division of the Texas Department of Criminal
Justice. Pursuant to Federal Rule of Civil Procedure 25(d), Davis is
automatically substituted as the party of record.

child. (Clerk's R., vol. 1, 2, ECF No. 12-12.) Petitioner's jury trial commenced on February 6, 2012. Referring to the child complainant as "Boy" to protect his identity, the Second District Court of Appeals of Texas summarized the testimony at trial as follows:

> After a divorce when Boy, born July 10, 2003, was roughly three years old, working mother (Mom) needed childcare for Boy. Having children around Boy's age, Mom's sister (Wife) and Wife's husband (Lair), offered to help for free. It was decided that Boy would stay overnight with Lair and Wife frequently on Friday nights because Mom worked Saturdays. It was not unusual for Lair to buy candy and toys for the children, Boy's toys were often "better than everyone else's," and Boy described Lair as his "best friend." Boy typically slept in the room with Lair, but Lair's own children slept in their own rooms and Wife slept on the couch. By Wife's account, she and Lair were more like "roommates" than husband and wife. By Mom's account, Lair and Boy had a father-and-son-like relationship, Boy loved Lair, and Lair would request that Boy stay over.

> Mom and Boy, then five years old, were riding from daycare on November 25, 2008, when Mom told Boy that he was going to spend the night with Wife and Lair. Boy protested, "Okay, but [Lair] makes me do stuff." When Mom asked Boy what type of things, Boy responded that Lair "makes me touch his privates." Boy explained that Lair would put his "privates" in Boy's mouth and "wiggle it around." Boy described how Lair would "pee in his mouth," and that the "pee" was "sticky." Boy said that this was his and Lair's "secret" and that he was not supposed to tell anyone. Mom inquired whether Lair ever touched Boy in a similar manner, and Boy described that Lair would touch Boy's "privates" and "wiggle them around in his hand." At one point, Mom became emotional, and Boy responded that Lair "only touched my front parts, he didn't touch my back privates." After discussing this outcry with other family members, Mom contacted the police.

> Stephanie Nick, a child forensic interviewer, interviewed Boy the next day. Boy told Nick the same

things that he had told Mom regarding Lair putting his penis in Boy's mouth and ejaculating. But Boy also described that Lair had put his penis in Boy's anus. According to Nick, Boy "pointed to his front genital area and said that, [Lair] would put that, and then pointed to his bottom." Boy used the term "bottom hole" to explain where Lair had put his penis. By Nick's account, Boy described these acts as "gooey" but not painful. Boy also revealed that he was familiar with Lair's tattoo of a Texas longhorn, which Lair had on his front, lower hip. Pictures of Lair's tattoo were published to the jury. A video of the forensic interview was played for the jury.

Rebecca Sullivan, a sexual assault examiner, examined Boy after the forensic interview. Boy told Sullivan that Lair had put his penis in his mouth and bottom. Sullivan testified that Boy said that Lair had put his penis in Boy's anus and that Boy said that it hurt, but there was no bleeding.

By the time of his trial testimony, February 8, 2012, Boy was eight years old. Boy testified that he and Lair had a "secret" and that Lair would take him to buy candy "if I would do this thing for him." Boy described how he would sleep in the bed with Lair when he would stay overnight, and how the other children and Wife would sleep elsewhere. Boy stated that Lair put "his wiener" in Boy's mouth and that Lair would "pee in [Boy's] mouth, and [Boy] would have to go to the restroom and spit it out." Boy described Lair's "pee" as "green." Boy further testified that Lair "would put his wiener in [Boy's] butt." Boy also stated that Lair would put Boy's penis in Lair's mouth.

A jury found Lair guilty of one count of aggravated sexual assault of a child, by causing Boy's mouth to contact Lair's penis, and one count of indecency with a child, for engaging in sexual contact by touching Boy's genitals. The jury was unable to reach a verdict on a count of sexual assault alleging that Lair caused Boy's anus to contact Lair's penis; thus, a mistrial was declared on that count. After a punishment hearing, the jury sentenced Lair to life imprisonment and a $10,000 fine for the aggravated-sexual-assault-of-a-child count and twenty years' confinement and a $10,000 fine for the indecency-with-a-child count.

(Mem. Op. 2-4, ECF No. 12-4 (footnote omitted).)

Petitioner appealed his convictions, but the Second District Court of Appeals of Texas affirmed the trial court's judgment and the Texas Court of Criminal Appeals refused Petitioner's petition for discretionary review. (Docket Sheet 1-2, ECF No. 12-2.) Petitioner also filed a state habeas-corpus application challenging his convictions, which was denied by the Texas Court of Criminal Appeals without written order on the findings of the trial court after a hearing. (WR-83,829-01, ECF No. 12-27 & Action Taken, ECF No. 12-19.) This federal petition followed.

## II.  ISSUES

Petitioner raises two grounds for relief, wherein he claims he received ineffective assistance of trial counsel at both the guilt/innocence and punishment phases of his trial. (Pet. 6-6(c), ECF No. 1.)

## III.  RULE 5 STATEMENT

Respondent does not contend that the petition is time-barred or subject to the successive-petition bar or that Petitioner has failed to exhaust his state court remedies as to the claims raised. (Resp't's Answer 6, ECF No. 15.)

## IV.   LEGAL STANDARD FOR GRANTING HABEAS-CORPUS RELIEF

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). See 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet but "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *See Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. A petitioner has the burden of rebutting the presumption of correctness by clear-and-convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

Finally, when the Texas Court of Criminal Appeals denies relief in a state habeas-corpus application without written opinion, it is "presumed that the state court adjudicated the claim on the merits

5

in the absence of any indication or state-law procedural principles to the contrary." *Harrington,* 562 U.S. at 99. Under these circumstances, a federal court may assume the state court applied correct standards of federal law to the facts, unless there is evidence that an incorrect standard was applied. *Townsend v. Sain,* 372 U.S. 293, 314 (1963)[2]; *Catalan v. Cockrell,* 315 F.3d 491, 493 n.3 (5th Cir. 2002); *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001); *Goodwin v. Johnson,* 132 F.3d 162, 183 (5th Cir. 1997).

## V. DISCUSSION

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To establish ineffective assistance of counsel, a petitioner must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697. In applying this test, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id.* at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made

---

[2]The standards of *Townsend v. Sain* have been incorporated into 28 U.S.C. § 2254(d). *Harris v. Oliver*, 645 F.2d 327, 330 n.2 (5th Cir. 1981).

to eliminate the distorting effects of hindsight. *Id.* at 689.

The Supreme Court emphasized in *Harrington* the standard under which a federal court is to consider an ineffective-assistance-of-counsel claim raised in a habeas petition subject to AEDPA's strictures:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

562 U.S. at 101 (quoting *Williams v. Taylor,* 529 U.S. 362, 410 (2000)). Accordingly, it is necessary only to determine whether the state courts' rejection of petitioner's ineffective-assistance claims was contrary to or an objectively unreasonable application of *Strickland. Bell v. Cone,* 535 U.S. 685, 698-99 (2002); *Kittelson v. Dretke,* 426 F.3d 306, 315-17 (5th Cir. 2005); *Schaetzle v. Cockrell,* 343 F.3d 440, 443 (5th Cir. 2003).

Petitioner was represented at trial by Scott Brown, licensed since 1990 and board certified in criminal law. (WR-83,829-01 153, ECF No. 12-27.) Petitioner claims that counsel was ineffective during the guilt/innocence phase of his trial as follows (all adults

7

named in this opinion are referred to by their first name and last initial, except Petitioner, Petitioner's trial counsel, law enforcement officers, and expert witnesses; all children are referred to by their first and last initials, if found in the record):

(1) Counsel was ineffective by failing to present evidence and argument that the victim, B.M., was coached, that Petitioner and Brandi M. were going through a contentious divorce, and that Brandi M. and her sister had conspired against him so Brandi M. could have sole custody of the children; and

(2) Counsel was ineffective by failing to refute or challenge Brandi M.'s false testimony that she slept on the couch and he slept in the bed, creating the impression that Petitioner did not have a sexual interest in adult women, when, in fact, she only began sleeping on the couch after starting an affair with another man in October 2007.

Petitioner claims that counsel was ineffective during the punishment phase of his trial as follows:

(1) Counsel was ineffective by failing to call character witnesses to testify to his good character and admirable qualities;

(2) Counsel was ineffective by failing to object to the admissibility of Amy A.'s testimony concerning the alleged outcry made by her son ten years earlier and to argue to the jury that the alleged offense had not been proven beyond a reasonable doubt; and

(3) Counsel was ineffective by arguing to the jury that based on the evidence, "your initial reaction is most likely, I'm going to go back there, and I'm going to write in life. That's probably what you're thinking," thus implying that he believed the case justified a life sentence.

(*Id.* at 6-6(c).)

Petitioner raised his ineffective-assistance claims in his state habeas application and provided supporting evidence, including affidavits from Petitioner's friends Gary S. and Paul W., Petitioner's parents Sheila and Bill L., and Petitioner's sister Tracey M. (WR-83,829-01, vol. 1 at 7-10, 44-49, 70-72, ECF No. 12-27.) The state habeas court ordered trial counsel to submit an affidavit addressing Petitioner's claims and held a live evidentiary hearing. At the live hearing, Petitioner called trial counsel to testify and two family members—his mother and sister who testified that they were present during the punishment phase, that they were willing to testify to Petitioner's good character, and that they would have been able to control their emotions after the jury's guilty verdict, notwithstanding their belief that Petitioner was innocent. (Reporter's R., vol. 2, 92-128, ECF No. 12-21.)

In his affidavit filed in the state habeas proceeding, counsel provided a thorough explanation of his representation of Petitioner, including the nature and extent of his investigation into the law and facts of the case, and the reasons for making decisions regarding trial strategy. Specifically, counsel averred, in part (all spelling and/or grammatical errors are in the original)—

> During my initial meeting with Mr. Lair, he told me the following:
>
> • His wife, Brandi M., had been cheating on him;
> • He and Brandi M. had three children: K._., J.M., and K.M.;
> • K._. is Brandi's child from a different father;
> • J.M. and K.M. are the biological children of Mr.

Lair and Brandi M.;
- Brandi M.'s sister, Lisa M., was B.M.'s mother;
- He believed these allegations were fabricated by Brandi M. and Lisa M. in order to get Mr. Lair out of Brandi M.'s life and to keep him from seeing his children;
- He believed B.M. had been coached by his mother, Lisa M., to make these allegations;
- He had babysat B.M. since B.M.'s birth;
- He had previously been employed as a daycare worker.

Prior to the criminal case being filed by the Tarrant County District Attorney's Office, Child Protective Services (CPS) conducted two separate investigations. The first dealt with B.M.'s accusations against [Mr. Lair]. The second involved a CPS investigation into any potential abuse of K._., J.M., and K.M. On December 22, 2008, I met with CPS investigator, Beth Hobbs, to discuss her investigation. At that time, Ms Hobbs had completed her investigation into any abuse by Mr. Lair of his children and "ruled out" any such abuse. . . .

On April 6, 2009, the case was filed with the Tarrant County District Attorney's Office. Pursuant to the District Attorney's open file policy at that time, I was not able to get access to Mr. Lair's entire file prior to indictment. I was able to review the felony information and get a copy of the arrest warrant and affidavit. With this information, as well as Mr. Lair's version of events, I was able to do some preliminary investigation into the facts of the case. I was unable to develop any facts that I believed were sufficient to achieve a "no bill" from the grand jury and, therefore, I did not make a grand jury presentation.

The case was indicted on August 24, 2009. At that point, I was able to review the prosecutor's entire file. This included the following:

- the indictment;
- the Keller Police Department offense report;
- the previously mentioned arrest warrant and affidavit;
- the search warrant for a blue and white toothbrush, seminal fluids and residue from the toothbrush, saliva and residue from the toothbrush, and sheets, blankets, mattresses and/or comforters;
- the return and inventory for the aforementioned

10

search warrant (which I immediately noticed did not
match the search warrant as the officers had
collected a white trash can and the toothbrush but
they had not collected the sheets, blankets,
mattresses and/or comforters);
- the search warrant for Mr. Lair's saliva;
- the search warrant for photographs of tattoos on Mr.
  Lair's body;
- Lisa M.'s written statement;
- Brandi M.'s written statement;
- The Cook Children's Medical Center records for the
  sexual assault examination of B.M. conducted on
  December 4, 2008;

At a later date, I reviewed the following:

- The DPS Garland Crime Lab Serology/DNA report dated
  November 23, 2009.

This report indicated that no DNA testing was performed
on any of the evidence collected from Mr. Lair's house.
Presumptive testing for semen proved negative on the
following items:

- A teal and white Toothbrush;
- A green toothbrush;
- A pink and purple toothbrush; and a [sic]
- A purple and yellow toothbrush.

        . . .

On December 22, 2009, I issued a subpoena for all CPS
records involving B.M., Paul Lair, Brandi M. . . ., and
Lisa M. When I obtained these records, I reviewed them.

Within these CPS records were documents relating to the
CPS investigation into an extraneous offense: allegations
that Mr. Lair had engaged in the Sexual Abuse (as defined
by CPS) of H.L. while Mr. Lair was employed as a daycare
worker for Children's Courtyard in the early 2000s . . .
. At that time, H.L. was four years old. The specific
allegation was that another daycare employee, Candace D.,
walked into the four year old room at naptime and
observed Mr. Lair lying behind H.L. in a parallel
position. According to Candace] D., H.L. had his pants
and underwear down to his ankles. [Candace] D. . . . gave
a written statement in May, 2009 which I reviewed within
the DPS records.

11

A second daycare employee, Terry V., indicated that she had observed Mr. Lair lying behind children at naptime but had not noticed anyone's clothes being off. [Terry] V. provided a written statement in May, 2009 which I reviewed within the CPS records.

Within these same CPS records was a summary of a 2009 interview with H.L.'s mother, Renee M. Among other things, [Renee] M. indicated that Mr. Lair had taken a "liking" to H.L. and offered to care for H.L. outside of daycare hours at Mr. Lair's home. [Renee] M. indicated she never allowed Mr. Lair to take care of H.L. outside of the daycare.

Within these CPS records was a summary of a forensic interview of H.L. conducted in May, 2009. The summary indicated that H.L. did not make an outcry of sexual abuse against Mr. Lair. I obtained a copy of this interview, watched it, and had it transcribed.

Within these CPS records was a reference to a second extraneous offense involving L.G., another child from Children's Courtyard. Through the discovery process, I obtained a copy of a forensic interview of L.G. conducted on August 14, 2001. I watched this interview and had it transcribed. During this interview, L.G. indicates that he is four years old and goes to school. L.G. makes an outcry that his teacher, Mr. Paul, has touched his "pee pee" with his hand.

I obtained and reviewed the Children's Courtyard records regarding Mr. Lair, H.L., L.G., and potential witnesses to these allegations.

I also obtained and reviewed the records of the Primrose School of Keller, Mr. Lair's employer prior to Children's Courtyard. Within these records was a note indicating Mr. Lair had been reprimanded for "lap sitting and massaging of Ryan by Paul." The note indicated that, when confronted about this incident, Mr. Lair "agreed to stop all this contact."

A civil lawsuit was filed against Children's Courtyard and Mr. Lair by the parents of H.L. and L.G. I obtained and reviewed the videotaped depositions (and the written transcriptions) of the following individuals:

• Ranee M., mother of H.L.;

12

- Aimee A., mother of L.G.; and
- Candace H., the aforementioned witness to the allegation involving H.L.

Michelle B., the Director of the Children's Courtyard where Mr. Lair worked, testified before the Grand Jury on August 24, 2009. I obtained and reviewed the written transcription of [Michelle] B.'s grand jury testimony. [Michelle] B. also provided a written statement to Detective Tom Barnett on May 14, 2009. I reviewed this statement as part of the Tarrant County District Attorney's open file policy.

. . .

In August 2010, I reviewed the Cook Children's Medical Center psychological counseling records for B.M.

In approximately July, 2010, I made the decision that having co-counsel would be beneficial to Mr. Lair's defense. . . . I obtained approval from Mr. Lair for retaining Ms. [Katheryn] Haywood. Therefore, I retained her as co-counsel and provided her a copy of the entire file. I had a meeting with Ms. Haywood and explained the facts of the case. I also discussed the various legal issues as I saw them.

When I received a copy of B.M.'s forensic interview (with Stephanie Nick), I had it transcribed. This transcription was completed on August 2nd, 2010. In addition to reviewing the interview and the transcript, I also retained Dr. Michael Gottlieb, a forensic and family psychologist with an office in Dallas. I provided Dr. Gottlieb a copy of B.M.'s forensic interview as well as a copy of all relevant documents in Mr. Lair's case . . . . After Dr. Gottlieb had a chance to review the provided information, we discussed Mr. Lair's case on several occasions. I was interested in anything Dr. Gottlieb saw, from a psychological standpoint, that would assist Mr. Lair's case and/or point to any credibility issues on the part of B.M. and his accusations. Dr. Gottlieb was unable to provide any assistance.

I was of the opinion that offering [the video of] B.M.'s [forensic] interview into evidence might be a good idea in order to impeach his credibility. This was not a decision that I took lightly. I had Ms. Haywood watch the forensic interview and we discussed the pros and cons of

such a course of action. . . .

During the trial, I determined that offering the . . . video was the best way to show the inconsistencies, and impossibilities, of B.M.'s statements. Therefore, I offered the entire interview into evidence and it was admitted.

        . . .

On August 27, 2010, I filed Defendant's First Amended Motion in Limine to specifically address the fact that Mr. Lair worked in the "Childcare/Daycare profession" and the fact that he had worked for the Children's Courtyard. I did this because I was concerned that if the jurors knew Mr. Lair had worked at a daycare, this would immediately prejudice them again him. During Mr. Lair's trial, before any witnesses testified, I obtained a ruling on the motion and asked the judge to order the prosecution to instruct all of their witnesses to abide by this limine. The judge granted my motion and specifically instructed the prosecutors as I requested.

After reviewing the records, I determined that B.M. had given at least four separate statements on the topic of sexual abuse by Mr. Lair[.] . . .

I also determined that Lisa M. had given two separate statements on the topic of her conversations with B.M. on November 25, 2008 . . . .

I reviewed each of these statements closely and noted the differences and inconsistencies between them. I used these inconsistencies as the basis for several of my cross examination  questions  of  B.M.,  Lisa  M.,  and  Rebecca Sullivan[, the SANE nurse].

        . . .

I had numerous in person conversations with Mr. Lair over the course of my representation of him. During these conversations, Mr. Lair consistently indicated his opinion that  Brandi  M.  and  Lisa  M.  had  fabricated  these allegations in order to get him out of the lives of Brandi and their children. Mr. Lair also believed that Lisa M. was coaching B.M. and telling him what to say.

During one of my conferences with Mr. Lair, we discussed

14

the specifics of the allegations B.M. had made against Mr. Lair: i.e. exactly when, where, and how they had occurred. It was at this meeting that Mr. Lair indicated to me that some of the physical descriptions B.M. gave of the house were inaccurate. For instance, B.M. described a bed and a shower curtain that Mr. Lair indicated had never existed in his home.

I met with Brandi M. at her home on several different occasions to discuss her knowledge of facts relevant to B.M.'s allegations against Mr. Lair. At that time, Brandi M. was living in the same house in which the sexual abuse had allegedly occurred. Among other things, Brandi M. corroborated that the bed and shower curtain B.M. had described had never existed at that house. This was very important to me because I knew, from experience, that the State's forensic interviewer and/or child abuse expert would testify that the child's ability to remember sensory details is a significant factor in determining whether the abuse occurred.

I had my investigator take pictures of the house, including detailed pictures of each room in the house. I also had an architect create a diagram of the house showing the layout of the house and indicting the square footage.

In July, 2010, I met with Detective Tom Barnett of the Keller Police Department. I had reviewed Detective Barnett's entire report and asked him questions relevant to his investigation of the case. . . .

On August 12, 2010, I met with Rebecca Sullivan, the nurse who performed the sexual assault examination of B.M. I had reviewed her report prior to our meeting and asked questions to clarify exactly how she conducted her examination.

After gathering information and investigating the facts, I determined that the best defenses to present in Mr. Lair's case were the following:

- B.M.'s inability to tell a consistent story showed he was not credible;
- B.M.'s inaccurate physical description of the bed and shower curtain indicated the sexual abuse did not occur;
- There was no scientific evidence such as DNA test results to support B.M.'s allegations (and, there

15

should have been if the sexual abuse occurred as B.M. described it);
- B.M. was not credible with regard to his description of anal sex (Mr. Lair inserting his penis into B.M.'s anus) as feeling like "nothing" and not hurting; and
- The house was too small and there were too many other people present for the sexual assault to have occurred as B.M. alleged.

In order to communicate the DNA-related issues to the jury, I retained Dr. Robert Benjamin as an expert witness . . . in the forensic application of DNA analysis. I provided Dr. Benjamin a copy of all the documents necessary for him to form an opinion with regard to DNA evidence in Mr. Lair's case. Dr. Benjamin testified with regard to DNA testing in general and how a person's DNA can remain on an object for more than 20 years. Dr. Benjamin testified that cloth is good retainer of DNA. I asked Dr. Benjamin about this to highlight the fact that the Keller Police officers had a search warrant authorizing the collection of some very relevant evidence (Mr. Lair's sheet, blankets, mattresses and/or comforters) but they failed to collect them. Dr. Benjamin also testified that a toothbrush is a good retainer of DNA. I had Dr. Benjamin testify about this because B.M. had indicated he would brush his teeth after Mr. Lair had ejaculated in his mouth. Therefore, the fact that no semen was found on any of the toothbrushes in Mr. Lair's house impeached B.M.'s credibility on that topic.

In order to communicate to the jury the fact that B.M.'s description of the sexual abuse (especially the anal penetration) was not supported by sound medical opinion, I retained the services of Evangeline Barefoot, the Sexual Abuse Nurse Examiner for Johns Community Hospital in Taylor, Texas . . .). I provided Ms. Barefoot a copy of documents in Mr. Lair's file necessary for her to form a medical opinion. Ms. Haywood and I traveled to Taylor, Texas and interviewed Ms. Barefoot. We called Ms. Barefoot as a witness at Mr. Lair's trial. Ms. Barefoot testified as to her interpretation of the sexual assault examination of B.M. Ms. Barefoot was critical of the manner in which the examination had been conducted and gave her opinion that there was no indication that B.M. had any trauma to his rectal area. Taken as a whole, Ms. Barefoot's testimony gave the jury her impression that B.M.'s accusation of sexual abuse by Mr. Lair was not believable.

After gathering information and investigating the facts,

16

I determined that, in addition to the obvious allegations of sexual abuse, the following were detrimental and dangerous facts that I had to address:

- The extraneous offenses involving H.L. and L.G.;
- The extraneous offenses involving "R._." at The Primrose School;
- Brandi M.'s statement that she had walked in on Mr. Lair and B.M. on the bed in their underwear in a compromising position;
- The fact that B.M. accurately described a longhorn-shaped tattoo that Mr. Lair had near his pelvic area in a place that would be covered by pants and underwear; and
- The fact that Mr. Lair had been a daycare employee working with young children.

As previously mentioned, I interviewed Brandi M. on several occasions. Prior to interviewing Brandi M., I had reviewed her written statement given to Detective Tom Barnett on May 20, 2009. In this statement, Brandi M. states, among other things that:

- After October 2007, she and Paul did not sleep in the same bed. She would sleep on the couch and Paul would sleep in the master bedroom;
- Around October, 2008, she had walked into the bedroom and seen Paul and B.M. on the bed wearing only underwear. Paul was lying on his side facing the door and watching television. B.M. was on his knees near Paul's feet facing Paul.

Each time I spoke with Brandi M., she consistently told me that she and Paul hadn't slept in the same bed for a long time and that she had walked in on Paul and B.M. on the bed in their underwear. On the latter incident, Brandi M. told me she didn't think it was suspicious and did not report it to the authorities.

Brandi M. also indicted to me the following:

- Her three children were at the house every time B.M. was there;
- Brandi M. was home most of the time B.M. was there;
- When B.M. was there, she would put B.M. and J.M. to bed on the floor next to Paul's bed . . . . B.M. would usually move to the bed with Paul and Justin would sometimes move to his own bed across the hall;

- The door to the master bedroom did not lock.

During my interviews with Brandi M., I also interviewed K._., J.M., and K.M. I interviewed each of them separately. None of the children were able to provide any beneficial information with regard to the defense of Mr. Lair. . . .

At one point during my representation of Mr. Lair, he indicated to me that B.M. had made some statements to J.M. that amounted to a recantation. I questioned J.M. about this but he had no memory of it.

I interviewed Sheila L., Bill L., and Tracy M. on several different occasions. They were all consistent in their belief that Paul was innocent. They were of the opinion that Brandi M. and Lisa M. had fabricated this story and that Lisa was coaching B.M. They were of the opinion that Paul was a good father, a good son, and he would never commit this type of offense. They were also of the opinion that Paul's divorce from Brandi M. was contentious and Brandi M. wanted to prevent Paul from seeing his children.

I interviewed Gary S., a person Mr. Lair indicated had been at his house on numerous occasions when B.M. was there and could contradict Brandi M.'s assertion that she and Paul did not sleep in the same bed. On August 11, 2010, I interviewed [Gary] S. in my office and he stated as follows:

- He met Mr. Lair approximately 15 years prior through a maintenance man at his apartments;
- In 2006, [Gary] S. got divorced;
- [Gary] S. spent a lot of time with Paul in 2006 and 2007;
- [Gary] S. and Mr. Lair would spend time together at each other's houses;
- [Gary] S. was not at Mr. Lair's house every often when B.M. was there;
- [Gary] S. would sometimes spend the night at Mr. Lair's house;
- [Gary] S. estimated he had spent the night at Mr. Lair's house approximately 15 to 20 times from 2006 through 2008;
- [Gary] S. did not remember spending the night at Mr. Lair's house when B.M. was present; and
- When [Gary] S. spent the night at Mr. Lair's house, he would sleep on the couch and Brandi M. would sleep in the bed with Paul.

18

After interviewing [Gary] S., I strongly considered calling him as a witness to contradict Brandi M.'s statement that she slept on the couch instead of in bed with Mr. Lair. However, I decided not to call [Gary] S. for the following reasons:

• [Gary] S. was never there when B.M. spent the night so he could not address the sleeping arrangements when B.M. was at Mr. Lair's house.
• In a time period of approximately two years, spending the night 15 to 20 times is not very significant;
• From my interview with [Gary] S., I got the impression that he and Mr. Lair were partying quite a bit when they were together . . . . I was concerned that, if this came out, the jury would not place much credence in [Gary] S.'s testimony.
• Brandi's testimony at trial was that she stopped sleeping in bed with Mr. Lair sometime in 2007. Her written statement to Detective Barrett indicated the date was October, 2007. Therefore, the potential impact of [Gary] S.'s testimony on this topic was lessened even more since a significant number of the times he stated he spent the night at Mr. Lair's would have occurred before October, 2007.

I did extensive research into the statutory and case law regarding the admissibility of extraneous offenses in sexual assault of children cases. Mr. Lair's case was tried prior to the amendment to Article 38.37 of the Texas Code of Criminal Procedure (which now allows the admissibility of extraneous sexual assaults and indecency offenses committed against children other than the victim in the indictment).

The controlling case law at the time of Mr. Lair's trial provided that the State court offer evidence of extraneous offenses if the defense put forth a defense of fabrication or frame-up. . . .

Based upon the controlling law in effect at the time of Mr. Lair's trial, I made a strategic decision not to present the following defenses:

• Mr. Lair and Brandi M. were involved in a contentious divorce;
• There was animosity between Mr. Lair and Brandi M.;
• Brandi M. wanted to prevent Mr. Lair from seeing his children;
• Brandi M. and her sister, Lisa M., fabricated the

allegations against Mr. Lair; and
- Lisa M. coached B.M. into making the allegations against Mr. Lair.

I was certain that presenting any of these defenses would have opened the door for the State to present, in the guilt/innocence portion of Mr. Lair's trial, evidence of the extraneous offenses involving H.L. and L.G. Allowing these extraneous offenses into evidence at the guilt/innocence portion of the trial did not seem like a sound strategic decision to me.

　　　. . .

Prior to trial (and to the present date) I was unaware of Brandi M. recanting any of the statements regarding sleeping on the couch or walking into the bedroom and observing Mr. Lair and B.M. in their underwear in a compromising position. If I had a tape recording of Brandi M. making such recantations, I would have made use of it at trial.

I have listened to the tape recorded conversations Mr. Lair has offered as an exhibit in support of his Application for Writ of Habeas Corpus. I have reviewed Applicant's summary of the recordings filed by Mr. Udashen [Petitioner's state and federal habeas counsel] . . . . I would point out to the Court that the recording from November 29, 2011 . . . is not a conversation between Brandi M. and Mr. Lair. It is, in fact, a conversation between Mr. Lair and his sister, Tracy M. On this recording, Mr. Lair refers to a tape recording he has of Brandi M. allegedly recanting many allegations she has previously made. On several occasions during this recording, Mr. Lair states that he is not going to notify me of the existence of this recording or provide a copy of it to me. Nowhere in this recording does the voice of Brandi M. appear. Therefore, nowhere in this recording does Brandi M. make the statements attributed to her by Applicant in his summary.

The December 1, 2011 . . . recording is a conversation between Mr. Lair and Brandi M. (and their children). However, Brandi M. does not make any of the statements attributed to her in Applicant's summary filed March 18, 2015.

Prior to trial, I did extensive legal research on the topic of the required notice of an extraneous offense. . . .

Prior to trial, I did extensive research on the topic of the burden of proof with regard to extraneous offenses as well as the admissibility of outcry testimony. A hearing was conducted outside the presence of the jury to determine the admissibility of Amy A.'s outcry testimony, in the punishment phase of the trial, regarding her son L.G. After her testimony outside the presence of the jury, I objected to her testimony based upon the reliability factors listed in the outcry statute, Article 38.072 of the Texas Code of Criminal Procedure. The judge allowed [Amy A.] to testify but did grant my separate objection and did not allow [Amy A.] to testify that L.G. told her Mr. Lair also sexually abused another child, C._.

I did not object to this testimony based upon the lack of proof that the offense had been committed because that would have been a frivolous objection: that is simply not the controlling law on this topic. The case law is clear that the trial court makes the initial determination as to the admissibility of relevant evidence and the jury determines whether the burden of proof has been satisfied. This is so because the determination of whether the proponent of the evidence has carried their burden of proof falls to the fact finder, the jury. . . .

The Court's punishment charge to the jury was short, approximately two pages of instructions. Placed prominently was paragraph three on page two. This instruction contained the proper instruction with regard to the burden of proof for extraneous offenses. It told the jury not to consider such extraneous offense evidence for any purpose unless they believed beyond a reasonable doubt that Mr. Lair committed those offenses.

After the State rested its case in punishment, I had a strategic decision to make as to whether to call Mr. Lair's family as character witnesses. Mr. Lairs' family, including Sheila L., Bill L., Tracy M., and Rick M., had been present outside the courtroom during Mr. Lair's trial. I had previously interviewed these witnesses and was, therefore, aware of their opinions of Mr. Lair's character. Apart from their opinion as to Mr. Lair's character, none of these witnesses had ever provided any additional facts regarding Mr. Lair that I believed amounted to significant mitigating testimony.

I was also aware of these witnesses' opinions of B.M.'s

21

allegations, as well as their opinion of Brandi M. and Lisa M. being the orchestrators of these allegations. I had spoken to these witnesses prior to trial and on several occasions while the jury was deliberating on guilt/innocence (a period of approximately ten hours).

In my discussions with the family after the guilty verdict was returned, I was very concerned about how they would act while on the stand. They were shocked and angry at the verdict and I was concerned that any or all of them might say something that could be construed by the jurors as attacking them personally for their verdict or as arguing with the jury's verdict. I knew that the prosecutors would do their best to agitate this situation and, therefore, I made the decision not to call any of them to the stand. I made my decision not to call these witnesses based upon my interviews with them prior to trial, my interviews of them during the trial, my opinion of how I believed they would behave on the stand based upon my previous interaction with them, and my belief that they would likely testify in a manner that would aggravate the jurors.

I did not call [Gary] S. as a character witness because, as I previously noted, my interview with him lead me to the conclusion that he had known Mr. Lair primarily in a partying capacity. I was concerned that the jury would not give [Gary] S.'s testimony much weight. Additionally, I had information from [Gary] S. that Mr. Lair had provided childcare for his son, J.S., when J.S. was young. I was concerned that this would be very damaging if the jury learned of this fact after having found Mr. Lair guilty of the allegations involving B.M., and having heard testimony regarding the extraneous offenses involving H.L. and L.G.

With regard to my closing argument at punishment, Applicant mischaracterizes it. This jury had just found Mr. Lair guilty of a serious offense and had heard testimony regarding two extraneous offenses involving sexual abuse of children. The point I was trying to make, and made, was that the minimum punishment for Mr. Lair was 25 years and that was a substantial amount of time. As I stated in the remainder of my closing argument, a person can change dramatically in 25 years. I also highlighted to the jurors the fact that 25 years in prison is significantly more difficult than those same 25 years spent as a free person.

(WR-83,829-01, vol. 1, 75-92, ECF No. 12-27 (citations omitted).)

Counsel testified similarly during the live evidentiary hearing. (Reporter's R., Writ Hr'g, 9-91, ECF No. 12-21.)

Based on the documentary record, including the reporter's record of the live evidentiary hearing, and the judge's own recollection of the trial-court proceedings, the state habeas judge found counsel's testimony and affidavit credible and supported by the record and entered factual findings, too numerous to list here, refuting Petitioner's claims. (WR-83,829-01 153-64, ECF No. 12-27.) Applying *Strickland* to the totality of counsel's representation, the state court concluded that Petitioner failed to prove that counsel was ineffective, that counsel's representation fell below objective standards of reasonableness, or that there existed a reasonable probability that, but for counsel's alleged acts or omissions, the result of his trial would have been different. (*Id.* at 172-73.)

Petitioner fails to rebut the state court's findings of fact by clear-and-convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Thus, the findings, including the court's credibility findings, are entitled to a presumption of correctness. *Richards v. Quarterman,* 566 F.3d 553, 563-64 (5th Cir. 2009); *Galvan v. Cockrell,* 293 F.3d 760, 764 (5th Cir. 2002). Applying the appropriate deference and having independently reviewed Petitioner's claims in conjunction with the state court records, it does not appear that the state courts' application of *Strickland* was objectively unreasonable. Petitioner's claims are largely conclusory, refuted by the record, involve matters

of state law, or involve strategic and tactical decisions made by counsel, all of which generally do not entitle a state petitioner to federal habeas relief. *See Strickland,* 460 U.S. at 689 (holding strategic decisions by counsel are "virtually unchallengeable" and generally do not provide a basis for post-conviction relief on the grounds of ineffective assistance of counsel); *Johnson v. Cockrell,* 306 F.3d 249, 255 (5th Cir.2002) (concluding that counsel is not required to make futile motions or objections); *Green v. Johnson,* 160 F.3d 1029, 1042 (5th Cir. 1998) ("Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue."); *United States v. Martinez,* 974 F.2d 589, 591 (5th Cir. 1992) (decisions on closing argument are matters of trial strategy); *Alexander v. McCotter,* 775 F.2d 595, 602 (5th Cir. 1985) (ineffective assistance claims "based upon uncalled witnesses [are] not favored because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and . . . speculations as to what these witnesses would have testified [to] is too uncertain"). Petitioner has not demonstrated deficient performance or shown any reasonable probability that the outcome of his trial would have been different but for counsel's representation. A petitioner shoulders a heavy burden to overcome a presumption that his counsel's conduct is strategically motivated, and to refute the premise that "an attorney's actions are strongly presumed to have fallen within the

24

wide range of reasonable professional assistance." *Messer v. Kemp*, 760 F.2d 1080, 1090 (11th Cir. 1985). Petitioner has presented no evidentiary, factual, or legal basis in this federal habeas action that could lead the Court to conclude that the state courts unreasonably applied the standards set forth in *Strickland* based on the evidence presented in state court. 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to relief.

For the reasons discussed, the Court DENIES Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Further, a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner satisfies this standard by showing "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists of reason could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 326 (2003)(citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Upon review and consideration of the record in the above-referenced case as to whether Petitioner has made a showing that reasonable jurists would question this Court's rulings, the Court determines he has not and that a certificate of appealability should not issue for the reasons stated in this order.

Therefore, a certificate of appealability should not issue.

SIGNED March 15, 2017.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE